9 P.3d 858 (2000)
STATE of Washington, Respondent,
v.
Charles "Chuck" NOAH, Appellant.
David L. Calof, d/b/a Family Psychotherapy Practice of Seattle, Respondent,
v.
Francie Casebeer, Appellant, James Joyce; Charles "Chuck" Noah and June Noah, individually and as a marital community; Phil Hoxter and Susie Hoxter, individually and as a marital community; Gene Adams and Jane Doe Adams, individually and as a marital community; Patricia Prather and John Doe Prather, individually and as a marital community; Robert "Bob" Farkus and Jane Doe Farkus, individually and as a marital community; Bruce Baldwin and Jane Doe Baldwin, individually and as a marital community; The so called "Apple Dumpling Gang," an informal association; John Does 1-10 and Jane Does 1-10, individually and as a marital community, Defendants.
Nos. 41241-8-I, 43048-3-I.
Court of Appeals of Washington, Division 1.
September 11, 2000.
As Amended on Reconsideration October 30, 2000.
*862 David Utevsky, Foster Pepper & Sheleman, Aaron Caplan, ACLU of Washington, William Crittenden, Elena Garella, Law Office of Arnold Barer, Seattle, for Appellants.
Stephen Anderson, Douglass North, Maltman Reed North Ahrens & Manlanti, Sandra Widlan, Kristin Houser, Schroeter Goldmark & Bender PS, Rebecca Roe, Seattle, for Respondents. *859 *860 *861
*863 APPELWICK, J.
Noah and Casebeer were involved in activities protesting Calof's work in repressed memory recovery. Calof secured an antiharassment order against Noah. Noah was found in contempt for violating the antiharassment order. Noah challenges the antiharassment order and his conviction for contempt on the grounds it violated First Amendment rights including free speech, the right to picket, and the right to photograph Calof in public. We hold an antiharassment order may place enforceable limits of First Amendment rights as needed to enforce the no contact provisions of the order. We affirm the antiharassment order and his conviction for contempt.
Calof sued Casebeer and others for defamation and other injuries. Casebeer and others entered voluntarily and knowingly into a mediated settlement agreement. Casebeer repudiated the agreement on the grounds that she could not lawfully contract away First Amendment rights, such as speech and picketing. The trial court held that the agreement was enforceable. We hold that mere enforcement of the agreement does not constitute state action for purposes of constitutional analysis. The agreement is enforceable. We affirm.

FACTS
David L. Calof is a mental health counselor registered under the laws of the State of Washington and has practiced psychotherapy in the Seattle area for over 25 years. Calof works generally in the area of trauma treatment with a special interest in the treatment of people suffering the affects of childhood sexual, physical and emotional abuse. In addition to his therapy practice, Calof presents at a number of national and international conferences, seminars and professional meetings each year.
STATE v. NOAH
Charles Noah's daughter accused him of having sexually abused her when she was a child. Noah denied the accusations and blames his daughter's therapist, Linda McDonald, for the revelations. Noah protested McDonald's practice. His conduct resulted in an antiharassment order being issued.
In 1995, though David Calof never had a professional or personal relationship with Noah or his daughter, Noah picketed along the sidewalk in front of Calof's office allegedly protesting recovered memory therapy. He displayed signs such as "Voodoo Therapy Practiced Here," "David Calof, Mr. Windbag! Psychotherapist," "Big Bucks For Therapy Spreading Child Abuse Hysteria," and "David Calof Voice of Hatred And Revenge."
Calof claims Noah harassed him in his personal and professional life. On May 5, 1995, Noah entered Calof's office and approached and spoke with one of Calof's clients. Noah made an unsolicited telephone call to Calof's private residence. On another occasion, Calof postponed a hearing citing his father's illness as an excuse, and Noah attempted to locate Calof's father to verify whether he was truly ill. Calof's lease was up for renewal in July 1995. Noah called Calof's landlord on at least one occasion.
Calof alleges that Noah conducted his picketing in such a way that harmed Calof, his employees and patients. In entering the building, Calof's staff could not "easily avoid passing by him." Calof claims that as a result many patients either used the back door to the office or cancelled appointments. Calof also claims that Noah used cameras and video equipment to photograph him, his clients, and his staff. Calof claims he suffered emotional distress, pecuniary loss, and damage to his professional reputation.
On April 26, 1995, the trial court issued a one-year antiharassment order, restraining Noah from contacting Calof or placing him under surveillance and prohibiting Noah from going within 250 feet of Calof's office or residence. Calof filed a motion for contempt and modification of the antiharassment order. On May 31, 1995, the trial court entered an amended antiharassment order. The new order specifically restrained Noah from photographing or videotaping near Calof's building, and aiding and abetting any person from doing the things prohibited to him. The court also increased the radius of the prohibited zone around Calof's building from 250 to 300 feet. Noah appealed the *864 district's order to the superior court which remanded the case for entry of findings of fact. On October 31, 1995, the district court entered its findings of fact and conclusions of law.
Calof filed a second contempt motion against Noah. On October 12 and 13, 1995, the district court heard Calof's second contempt motion. The court found that Noah remained outside the 300-foot zone, and that he had intentionally violated the order by "aiding and abetting and acting in concert with others in doing those things which he is himself forbidden to do directly." Noah was held in contempt.
Noah appealed both the antiharassment order and the finding of contempt to the superior court. Noah argued that the provisions of the antiharassment order that prohibited picketing within 300 feet from Calof's building were unconstitutional and that the order had expired. Noah did not object to the provisions prohibiting him from contacting Calof or from going within 300 feet of his home.
On July 31, 1997, the superior court found that the antiharassment order had improperly intruded into an area of constitutionally protected activity. The court found that the district court had "inappropriately considered" Noah's protected activities (i.e. peaceful picketing) as part of the conduct found to constitute harassment. It also found that the district court had erred in finding that Noah's picketing signs were libelous per se.
The provision restraining Noah from picketing within 300 feet of Calof's office was stricken as unconstitutional because it restrained a protected activity. In addition, the court held that it was error to issue an antiharassment order that remained in effect for more than one year without the statutorily required findings. Therefore, the order had expired as a matter of law on the anniversary of its issuance. The finding of contempt was affirmed, however, because the "erroneous portions of the Antiharassment Order were not void but merely voidable. The District Court therefore had the inherent power to punish contempt of the Antiharassment Order."
CALOF v. CASEBEER
Francie Casebeer began picketing outside Calof's office in 1995. Casebeer became involved in the picketing after her sister's therapy produced "memories" of abuse that alienated her from Casebeer and her parents. Casebeer associates Calof with repressed memory therapists.
Calof claims that Casebeer's picketing escalated to harassment. Calof filed suit against Casebeer and Noah alleging defamation, invasion of privacy, negligent and intentional infliction of emotional distress, tortious interference with business and professional relations, nuisance and civil conspiracy.
On December 19, 1997, following eleven hours of mediation, the parties reached a settlement agreement (agreement). Casebeer renounced the agreement. Calof filed a motion to enforce settlement. The superior court held a hearing and found that the agreement was knowingly and voluntarily entered into and granted the motion to enforce settlement on April 14, 1998.
Casebeer then brought a motion to invalidate the settlement on May 26, 1998, contesting the agreement's constitutionality. The superior court denied the motion stating that "[i]n this case we have a private agreement that regulates the conduct between these parties. The court does not recognize any constitutional infirmity in this agreement." Casebeer appeals the trial court's denial of the motion to invalidate agreement. She objects to the constitutionality of the agreement, but concedes that the agreement was knowingly and voluntarily entered into. Noah joined Casebeer's renunciation of the agreement at the initial hearing, but did not join on this appeal. The court of appeals linked the cases anticipating the potential for the settlement agreement in Casebeer might influence the result in Noah.

ANALYSIS
I. STATE v. NOAH: ANTIHARASMENT/CONTEMPT
A. Antiharassment Order
The Washington Constitution was amended in 1993 to allow the district court to *865 exercise jurisdiction in antiharassment cases by adding the following language: "Superior courts and district courts have concurrent jurisdiction in cases in equity." Wash. Const. art. 4, § 6 (amended 1993). The harassment statute implements the new constitutional grant of authority. RCW 10.14.150 provides:
(1) The district courts shall have jurisdiction and cognizance of any civil actions and proceedings brought under this chapter, except the district court shall transfer such actions and proceedings to the superior court when it is shown that the respondent to the petition is under eighteen years of age.
(2) Superior courts shall have concurrent jurisdiction to receive transfer of antiharassment petitions in cases where a district court judge makes findings of fact and conclusions of law showing that meritorious reasons exist for the transfer. The municipal and district courts shall have jurisdiction and cognizance of any criminal actions brought under RCW 10.14.120 and 10.14.170.
The district court may enter an antiharassment order after the victim "shows reasonable proof of unlawful harassment." RCW 10.14.080. Unlawful harassment is defined in RCW 10.14.020 as follows:
(1) "Unlawful harassment" means a knowing and willful course of conduct directed at a specific person which seriously alarms, annoys, harasses, or is detrimental to such person, and which serves no legitimate or lawful purpose. The course of conduct shall be such as would cause a reasonable person to suffer substantial emotional distress, and shall actually cause substantial emotional distress to the petitioner, or, when the course of conduct is contact by a person over age eighteen that would case a reasonable parent to fear for the wellbeing of their child.
(2) "Course of conduct" means a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose. "Course of conduct" includes, in addition to any other form of communication, contact, or conduct, the sending of an electronic communication. Constitutionally protected activity is not included within the meaning of "course of conduct."
Noah contends that the lawful exercise of his right of free speech and right to picket are excluded from the definition of "course of conduct," and cannot be the basis for an antiharassment order. He is absolutely correct. But these activities are not the sole basis of the trial court's order. Our inquiry is whether there was a factual basis for the antiharassment order, excluding consideration of the protected speech[1] and picketing.
The trial court's findings identify conduct other than speech and picketing as a basis for the order. The court made a finding that the police had informed Noah that he could not enter on Calof's private property without permission. The court's finding that Noah had been warned was not challenged on appeal. The trial court found Noah trespassed at Calof's office on May 5, 1995. This finding is supported by the testimony of Ms. McCanna, a client of Calof, who witnessed the trespass. The court made a finding that Noah made an unsolicited harassing phone call to Calof in the spring of 1995, which Calof perceived as threatening. Noah has not challenged the court's finding that Calof's landlord sent a representative to investigate on at least two occasions and that he expressed great concern. Calof's lease was up for renewal. Noah admits calling Calof's landlord at least once. Noah made a concerted effort to obtain the location of Calof's ill father who had undergone surgery.
The court found Noah's course of conduct to be knowing and wilfull, that it alarmed, annoyed, or harassed Calof and caused substantial emotional distress to him, and that it would have caused substantial emotional distress to a reasonable person. Substantial evidence supports these findings, and they provide a proper basis for entry of an antiharassment order. We find the district court *866 had the authority and jurisdiction to enter the antiharassment order.
Noah also challenges the specific provisions of the court's order. The statute allows the antiharassment order to be written very broadly. RCW 10.14.080(6) provides:
The court, in granting an ex parte temporary antiharassment protection order or a civil antiharassment protection order, shall have broad discretion to grant such relief as the court deems proper, including an order:
(a) Restraining the respondent from making any attempts to contact the petitioner;
(b) Restraining the respondent from making any attempts to keep the petitioner under surveillance;
(c) Requiring the respondent to stay a stated distance from the petitioner's residence and workplace; and
(d) Considering the provisions of RCW 9.41.800.[2]
The actual order imposed on Noah provided:
1.1 Respondent is RESTRAINED from harassing the petitioner and:
(a) Making any attempts to contact the petitioner; or members of his family
(b) Making any attempt to keep the petitioner or his workplace or home under surveillance.
(c) Going within 300 feet of the property line of petitioner's residence or workplace.
1.2 Respondent is further RESTRAINED from:
(a) Photographing or videotaping persons entering and leaving petitioner's building.
(b) Aiding or abetting in any way any person or persons, or acting in concert in any way with any person or persons or acting by proxy (to include Francine Casebeer and June Noah); in doing any of the things which are prohibited to Respondent himself in this court's order.
The provisions of paragraph 1.1 substantially track the statute. Noah asserts the order exceeded the court's authority on several grounds. He argues limiting the content of the signs constitutes a prior restraint. He asserts lawful picketing cannot be prohibited. The provision for a 300-foot distance between Noah and Calof was challenged as excessive. Noah claims photographing Calof in public cannot be enjoined as surveillance. Noah asserts that restraining him from aiding and abetting others in the proscribed activities, or doing indirectly what he cannot do directly, is erroneous.[3]
Noah argues any restrictions on his lawful picketing near Calof's business, and on the content of his signs, constitutes a prior restraint of his free speech. Prior restraints are presumptively unconstitutional unless they deal with non-protected speech. State v. Coe, 101 Wash.2d 364, 372, 679 P.2d 353 (1984). Prior restraints are "official restrictions imposed upon speech or other forms of expression in advance of actual publication." Coe, 101 Wash.2d at 372, 679 P.2d 353 (quoting Seattle v. Bittner, 81 Wash.2d 747, 756, 505 P.2d 126 (1973)).
A government regulation may not rise to the level of a prior restraint where it is merely a time, place or manner restriction. Coe, 101 Wash.2d at 373, 679 P.2d 353. Under the Federal Constitution, statutes regulating time, place or manner restriction are upheld if they are "content neutral, are narrowly tailored to serve significant government interest, and leave open ample alternative channels of communications." Frisby v. Schultz, 487 U.S. 474, 481, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988). Under the Washington Constitution, the standard is stricter: a "compelling" not "significant" government interest is required to uphold a statute regulating time, place or manner. Bering v. SHARE, 106 Wash.2d 212, 234, 721 P.2d 918 (1986); Frisby, 487 U.S. at 481, 108 S.Ct. 2495.
*867 Protecting citizens from harassment is a compelling state interest. The legislature authorizes the court to order that the defendant have no contact with his intended victim. Determining no contact distances in an antiharassment order is a case by case determination. The statute is content neutralno contactwhether profession of love, screams of hate or anything in between. The interest to be served is the safety, security, and peace of mind of the victim. It is narrowly tailored by focus on the victim and a no contact zone around the victim. It leaves open ample alternative channels of communications, by leaving open every alternative channel so long as no contact is made with the victim and the proscribed zone is not violated. The antiharassment order authorized by the statute is an appropriate time, place, and manner restriction. The order issued against Noah is consistent with the statute and does not constitute unconstitutional prior restraint.
The issues of picketing and the content of the signs were prominent in the trial court discussions. This type of protected speech could not properly form a basis for the trial court order. Nonetheless, the trial court relied on other bases for a finding of harassment. The court was therefore empowered by statute to prohibit all activity and attempts to communicate within the designated no contact zone. The order does not become void per se because it proscribes what would otherwise be constitutionally protected conduct. So long as the order contains restrictions that are valid time, place, and manner restrictions, it will be upheld.
Noah asserts that photographing or videotaping people in public cannot be surveillance, because there is no expectation of privacy. Authority for an absolute right to photograph or videotape someone is nonexistent. Even if such a privilege existed, limitations are appropriate here. Photographs and videotapes constitute records of visual surveillance. The trial court's enumeration of these methods of surveillance was perhaps unnecessary, but well within its statutory authority.
Noah challenges the 300-foot no contact zone as unconstitutional. He contends it is not a valid place restriction and relies on abortion clinic protest cases to establish that picketing and free speech restrictions have been upheld only in very small zones. Schenck v. Pro-Choice Network of Western New York, 519 U.S. 357, 371-72, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997) 15-foot buffer upheld; Madsen v. Women's Health Center, 512 U.S. 753, 758, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994), 36-foot buffer upheld. In a recent case, Hill v. Colorado, ___ U.S. ___, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000), the Supreme Court upheld an eight-foot zone around a person approaching a health care clinic. These precedents emphasizes the protection given to the public in free speech and picket activities around health clinics and in the context of the volatile abortion issue against statutes that restrict the public from such activity.
The harassment statute at issue here is different. It authorizes the court to protect a specific victim against contact by a harasser. The finding of a course of conduct that constitutes unlawful harassment precedes any restrictions. Unlike the abortion clinic statutes, the antiharassment statute does not focus on free speech activities. It focuses on the harasser, Noah. No one but Noah is covered by the order's 300-foot no contact zone. Everyone else is free to picket, to leaflet, and to display signs. Noah simply may not participate. Public discourse goes on without him.
The statute grants broad discretion to the trial court in devising an order that protects the victim. The determination of how much is enough or is too much is a caseby-case determination. The trial court believed 300 feet of distance was necessary distance from Calof's home and business. Noah had contacted Calof's landlord. He had trespassed on the property. His presence had caused fear in Calof and at least one client. Noah has not demonstrated an abuse of discretion by the trial court in setting the 300-foot distance.
Of course, a no contact zone's distance may be excessive. The superior court believed the 300 feet chosen by the district court was excessive. Even if we agreed with *868 the superior court, the order is only voidable and the distance provision subject to change. But we need not reach a decision on the 300foot distance for several reasons. First, the antiharassment order has long since expired. No prospective purpose would be served. Second, factually, it is inconsequential in the evaluation of Noah's contempt of court. All of the findings by the trial court placed the picketing, the photography, and photography display at the edge of the Calof property, directly in front of Calof's office building, at the edge of the driveway entrance, or in the street directly in front of Calof's building. Some of the conduct occurred at zero distance from the property. Clearly, we would uphold the enforcement of the order where prohibited conduct occurs that close to the victim's property in such an urban setting. Finally, even if we rejected the propriety of the 300-foot distance, the order would not be void, but merely voidable. The district court had constitutional and statutory jurisdiction and authority to impose a reasonable distance of no contact. The antiharassment order would be valid even if the distance provision were subject to revision. Thus, any attack in contempt proceedings would be collateral and unsuccessful. We therefore decline to affirm or reject the 300-foot distance in this case.
The antiharassment statute provides the court with authority to prohibit the harasser from "making any attempts to keep the [victim] under surveillance." RCW 10.14.080(6)(b). Surveillance is "close watch kept over one or more persons...." Webster's Third New International Dictionary 2302 (1993). The district court found that "[v]ideotaping and photographing the comings and goings of Mr. Calof, his staff and patients, and others going in and out of the building, is an act of surveillance of Mr. Calof...." Thus, as part of the antiharassment order the district court prohibited Noah from "photographing and videotaping persons entering and leaving [Calof'[s] building."
Noah challenges the order on the grounds that it protects people other than Calof when it prevents contact with and photographing of a person's entering and leaving the building. The district court findings reflect a belief that this activity did affect Calof by affecting his livelihood. Whether the district court was correct or whether the provision should have been limited to contact with and photographing Calof is of little consequence here. The order has expired. The provision would have been voidable at best; the order would not have been rendered void. And, Noah was not held in contempt for surveillance or photography of Calof's clients, but for surveillance of Calof himself. Absent clear constitutional authority to the contrary, we find nothing wrong with the provisions of paragraph 1.2(a).
The record contains substantial evidence that Noah provided signs to others who took up the picket activity within the no contact zone imposed on Noah. Substantial evidence also supports a finding that others photographed Calof after entry of the order. They provided the films to Noah who developed them, blew them up and delivered them back to others for display within the zone. Clearly, Noah violated both provisions of paragraph 1.2 of the Antiharassment Order.
B. Collateral Attack of Antiharassment Order and Contempt Finding
Noah disputes the validity of the superior court's contempt findings. He contends that the trial court erred in finding him in contempt for picketing and surveillance by means of aiding and abetting. Noah does not challenge the trial court's findings that while he stayed outside the 300-foot zone, he provided signs and vehicles to assist third parties in picketing. He does not challenge the trial court's finding that he acted in concert with third parties regarding photographing, and that he developed the film and displayed the blown up photographs. Noah challenges the contempt findings by collaterally attacking the May 31, 1995, antiharassment order. He challenges the court's authority to enjoin the picketing and photographing.
Contempt orders are within the discretion of the judge so ruling. Unless there is abuse in a trial court's exercise of discretion, it will not be disturbed on appeal. State *869 v. Caffrey, 70 Wash.2d 120, 122-23, 422 P.2d 307 (1966).
Parties held in contempt are barred from collaterally attacking the constitutionality of a law. In Walker v. City of Birmingham, 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967), the Supreme Court laid down the inviolate rule that a law must be obeyed even if unconstitutional and disobedience results in contempt. The law is nullified only if declared unconstitutional in appropriate proceedings, but cannot be collaterally attacked. Walker, 388 U.S. at 320-21, 87 S.Ct. 1824.
The collateral bar rule generally states that a court order cannot be "collaterally attacked in contempt proceedings arising from its violation, since a contempt judgment will normally stand even if the order violated was erroneous or was later ruled invalid." Detention of Broer v. State, 93 Wash.App. 852, 858, 957 P.2d 281 (1998) (quoting In re J.R.H., 83 Wash.App. 613, 616, 922 P.2d 206 (1996)). There is an important exception to the rule. A contempt order may be reversed if the underlying order is void. An underlying order is void if a court that lacked jurisdiction to do so entered it. Broer, 93 Wash. App. at 858, 957 P.2d 281 (citing Mead School Dist. No. 354 v. Mead Educ. Ass'n, 85 Wash.2d 278, 282, 534 P.2d 561 (1975)). In other words, a contempt judgment based on a void order may be collaterally attacked, but one based on an erroneous order cannot.
In arguing that the contempt finding can be collaterally attacked because the court lacked jurisdiction, Noah relies on Pearce v. Pearce, 37 Wash.2d 918, 226 P.2d 895 (1951), and Rainier National Bank v. McCracken, 26 Wash.App. 498, 615 P.2d 469 (1980). In Pearce, a dissolution action, the wife was held in contempt for violating a restraining order prohibiting her from associating with a male friend. The contempt order was held void because the underlying restraining order, precluding the wife's association with a third party, was entered in "excess of the jurisdiction of the court." Pearce, 37 Wash.2d at 923, 226 P.2d 895. But in Noah's case, the district court had proper jurisdiction to enter the antiharassment order. Under the Washington Constitution, the district court may exercise jurisdiction in antiharassment cases. The district court exercised its discretion within the scope of RCW 10.14.150. The order is not void and, therefore, Pearce is inapplicable.
In Rainier, the court held that a pre-trial order to deposit proceeds of a real estate contract into a court registry was not authorized by statute and the party claiming title to the funds could not be held in contempt for refusing to comply. Rainier, 26 Wash. App. at 509-10, 615 P.2d 469. The court found that the underlying order "invalid" because it was entered in excess of the court's statutory authority. Rainier, 26 Wash.App. at 509-10, 615 P.2d 469. Here, Calof showed reasonable proof of unlawful harassment. The district court complied with the antiharassment statute.
Noah confuses the distinction between an order that is void because a court lacks jurisdiction and one that is merely erroneous. What Noah alleges is really erroneous application. A court does not lose jurisdiction by interpreting the law erroneously. Broer, 93 Wash.App. at 858, 957 P.2d 281 (citing Marley v. Department of Labor and Indus., 125 Wash.2d 533, 539, 886 P.2d 189 (1994)). Noah violated the antiharassment order before directly challenging the constitutionality of the law of which it was based. Because we find the order was not void, the subsequent contempt order may not be attacked collaterally.
As discussed above, we find that the antiharassment order withstands direct constitutional challenge and is supported by substantial evidence. The order is not void. The trial court did not abuse its discretion. The order of contempt is affirmed.
II. CALOF v. CASEBEER: SETTLEMENT
Casebeer argues that judicial enforcement of the settlement agreement is unconstitutional. She claims that a person cannot contract away their First Amendment rights. Casebeer also says that the settlement agreement violates public policy because it inhibits debate on matters of public concern. Calof claims the settlement agreement withstands *870 constitutional attack because a First Amendment violation requires state action which is absent here. Furthermore, Calof contends that the policy favoring settlement overrides other considerations.
The court reviews the enforceability of a settlement agreement de novo. In re Marriage of Ferree, 71 Wash.App. 35, 41, 856 P.2d 706 (1993).
A. State Action
The First Amendment of the United States Constitution applies to the states through the due process clause of the Fourteenth Amendment. First Covenant Church of Seattle v. City of Seattle, 120 Wash.2d 203, 218, 840 P.2d 174 (1992); Hobbie v. Unemployment Appeals Comm'n of Florida, 480 U.S. 136, 139-40, 107 S.Ct. 1046, 94 L.Ed.2d 190, (1987). A state may adopt individual liberties under its own constitution greater than those conferred by the federal constitution. Southcenter Joint Venture v. NDPC, 113 Wash.2d 413, 420, 780 P.2d 1282 (1989). The Washington free speech provision affords greater protection to free speech than its federal counterpart. O'Day v. King County, 109 Wash.2d 796, 802, 749 P.2d 142 (1988).
A First Amendment violation requires state action. The First Amendment of the United States Constitution states that "Congress shall make no law ... abridging the freedom of speech, ...." The Constitution does not prohibit a private person's infringement of another's First Amendment rights: "It forbids only such infringements which may properly be attributable to the State." Stephanus v. Anderson, 26 Wash. App. 326, 335, 613 P.2d 533 (1980) (citing Lloyd Corp., Ltd. v. Tanner, 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972)). But private action may constitute state action where the State is significantly intertwined with the acts of the private parties. Stephanus, 26 Wash.App. at 335, 613 P.2d 533 (citing Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978)).
The Washington Supreme Court has held that the "state action" doctrine applies under Article 1, Section 5 of the Washington Constitution. But the free speech provision of the Constitution applies only against official state action, not to protect against action of private individuals. Southcenter, 113 Wash.2d at 430, 780 P.2d 1282.
Casebeer argues that judicial enforcement of a settlement agreement constitutes state action. She relies on Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948), where the United States Supreme Court found state action in the judicial enforcement of a racially restrictive covenant limiting real property ownership to Whites. The state action was the enforcement of the restrictions in the agreement. The Court held that the State did not abstain from acting but used its "full coercive power of government to deny to petitioners, on the grounds of race or color, the enjoyment of property rights...." Shelley, 334 U.S. at 19, 68 S.Ct. 836.
Shelley is distinguishable. In Shelley, the state action was more than mere judicial enforcement. The courts had to identify prospective African-American purchasers, determine the scope of the racially restrictive covenants and enforce them against the African-Americans. The covenant did not merely involve two private parties: its exclusionary function against all African-Americans required state action. See Stephanus, 26 Wash.App. at 337-39, 613 P.2d 533. The excluded parties were not party to the contract; they had not agreed to the restrictions. Rather, they were victims of the covenants between others. Here, the provisions to be enforced were in a settlement agreement, and solely between two private parties, and which had been knowingly and voluntarily entered into.
Casebeer also cites Cohen v. Cowles Media Co., 501 U.S. 663, 668, 111 S.Ct. 2513, 115 L.Ed.2d 586 (1991). In Cohen, the United States Supreme Court found state action where Cohen's only possibility of recovery was under a theory of promissory estoppel. The Court held that the application of this state-law doctrine "in the absence of a contract creates obligations never explicitly assumed by the parties. These legal obligations would be enforced through *871 the official power of the Minnesota courts. Under our cases, that is enough to constitute `state action' for purposes of the Fourteenth Amendment." Cohen, 501 U.S. at 668, 111 S.Ct. 2513.
This case is also distinguishable. In Cohen, the state created the duty before it enforced that duty. Unlike Cohen, judicial enforcement of the settlement agreement does not require application of a state common law doctrine to create the duty enforced.
Calof and Casebeer entered into a private agreement and, therefore, have corresponding contractual obligations. Casebeer concedes that the settlement agreement was knowingly and voluntarily entered into.
For the existence of a First Amendment violation, state action is required. State enforcement of a contract between two private parties is not state action, even where one party's free speech rights are restricted by that agreement. Therefore, the settlement agreement between Calof and Casebeer contains no constitutional First Amendment infirmity precluding its enforcement.
B. Public Policy
Casebeer argues that even if the First Amendment does not apply, the settlement agreement is unenforceable under basic contract law because it is against public policy. Casebeer contends that the general public interest in free speech and her individual interest in speaking out against repressed memory therapy outweigh the public interest in enforcing the settlement agreement. Finally, Casebeer argues that it is against public policy to relinquish First Amendment rights. Calof claims that enforcement of the settlement agreement promotes public policy by promoting private agreements and settling litigation.
Contract terms are unenforceable on grounds of public policy when the interest in its enforcement is clearly outweighed by a public policy against the enforcement of such terms. Restatement (Second) of Contracts § 178 (1981). The express public policy of the state is to encourage settlement. City of Seattle v. Blume, 134 Wash.2d 243, 258, 947 P.2d 223 (1997). The law "strongly favors" settlement. Seafirst Ctr. Ltd. Partnership v. Erickson, 127 Wash.2d 355, 365, 898 P.2d 299 (1995) (quoting Seafirst Ctr. Ltd. Partnership v. Kargianis, Austin & Erickson, 73 Wash.App. 471, 476, 866 P.2d 60 (1994)). We note by comparison that the legislature has limited gag orders in settlement agreements only in cases of certain toxic torts and product liability cases. See RCW 4.24.601.
Casebeer cites Davies v. Grossmont Union High Sch. Dist., 930 F.2d 1390 (9th Cir.1990) as invalidating a settlement agreement on First Amendment grounds. In Davies, a settlement agreement prohibited Davies from holding office in the defendant school district. After the settlement, Davies was elected to the school board. The district court found Davies in contempt and ordered him to resign. The Ninth Circuit court held that despite a knowing waiver of his right to seek or hold public office, the settlement agreement violated Davies constitutional right to run for public office. Davies, 930 F.2d at 1399-1400. But Davies does not involve a settlement agreement between two private parties. Davies is not applicable here because it was a case of state action where the school district was a party.
Casebeer concedes that she knowingly and voluntarily entered into the settlement agreement. The Supreme Court recognizes that knowing and voluntary waivers of constitutional rights are valid. Davies, 930 F.2d at 1394 (citing D.H. Overmyer Co. Inc. of Ohio v. Frick Co., 405 U.S. 174, 185, 187, 92 S.Ct. 775, 31 L.Ed.2d 124 (1972)). Furthermore, Casebeer's First Amendment rights are not all gone. Casebeer is free to picket at the county courthouse, federal building or the state capitol, for example. Casebeer may also present her ideas in other mediums such as published articles, the Internet, and radio. A balancing of competing public policies favors the interests furthered by settlement. We therefore affirm the settlement agreement between Calof and Casebeer.[4]
*872 III. CONCLUSION
The district court had jurisdiction to enter an antiharassment order against Noah. The district court did not abuse its discretion in finding Noah in contempt for violating that order. The order is valid and, therefore, is not subject to collateral attack. The contempt order against Noah is affirmed.
The challenged settlement agreement was knowingly and voluntarily entered into between Casebeer and Calof, and we find no constitutional basis or public policy ground to deny enforcement. We therefore affirm.
AGID and GROSS, JJ., concur.
NOTES
[1] Libelous speech is not protected and, therefore, may be a basis for an antiharassment order. Nonetheless, we will exclude it from our consideration.
[2] RCW 9.41.800 addresses restrictions on firearms and firearm licenses not at issue in this case.
[3] No portion of the brief is dedicated to this issue. It is deemed waived.
[4] All provisions in the settlement agreement will be enforced accordingly, including those relating to attorney fees, dismissal of bar complaints, and dismissal of claims against participating attorneys. Casebeer provides no additional constitutional infirmity nor cites case precedent on which we are compelled to strike these knowingly and voluntarily agreed to provisions.